# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| VOTE.ORG,<br>    *Plaintiff,*<br><br>v.<br><br>JACUELYN CALLANEN, in her official capacity as the Bexar County Elections Administrator; BRUCE ELFANT, in his official capacity as the Travis County Tax Assessor-Collector; REMI GARZA, in his official capacity as the Cameron County Elections Administrator; MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator,<br>    *Defendants,*<br><br>And<br><br>KEN PAXTON, in his official capacity as the Attorney General of Texas, LUPE C. TORRES, in his official capacity as Medina County Elections Administrator, and TERRIE PENDLEY, in her official capacity as Real County Tax Assessor-Collector,<br>    *Intervenor-Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 5:21-cv-00649 |

---

## DEFENDANTS KEN PAXTON & REMI GARZA'S
## MOTION FOR SUMMARY JUDGMENT

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

CHRISTOPHER D. HILTON
Chief for General Litigation Division

CORY SCANLON
Assistant Attorney General
State Bar No. 24104599
cory.scanlon@oag.texas.gov
KATHLEEN T. HUNKER*
Special Counsel
STATE BAR NO. 24118415
kathleen.hunker@oag.texas.gov
JOHNATHAN STONE
Assistant Attorney General
STATE BAR NO. 24071779
johnathan.stone@oag.texas.gov
MICHAEL R. ABRAMS
Assistant Solicitor General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone (512) 463-2120

**ATTORNEYS FOR DEFENDANT-INTERVENOR KEN PAXTON**

Daniel N. Lopez
Associate Counsel
Texas State Bar No. 24086699
Email: daniel.n.lopez@co.cameron.tx.us
Juan A. Gonzalez
Attorney in Charge
Texas State Bar No. 08129310
Email: juan.gonzalez@co.cameron.tx.us
Commissioners Court –
Civil Legal Division
1100 East Monroe Street
Brownsville, Texas 78520
Telephone: (956) 550-1345
Facsimile (956) 550-1348

**ATTORNEYS FOR DEFENDANT REMI GARZA**

**TABLE OF CONTENTS**

TABLE OF CONTENTS...........................................................................................iii

INDEX OF AUTHORITIES....................................................................................iv

STATEMENT OF GROUNDS & UNDISPUTED FACTS...................................... 1

   I.   Voter Registration Procedures in Texas ........................................................ 1

   II.  Vote.org approaches certain Texas County Officials in 2018. ....................... 4

   III.  Texas Secretary of State issues guidance to counties. .................................... 6

   IV.  Texas passes its latest "cleanup bill," HB 3107................................................ 7

   V.  Plaintiff sues County Defendants.................................................................... 8

   VI. Challenged Causes of Action............................................................................ 9

   VII. Defendants Paxton and Garza's Grounds for Summary Judgment................. 9

STATEMENT OF THE ISSUES............................................................................... 9

STANDARD OF REVIEW ..................................................................................... 10

ARGUMENT & AUTHORITIES ........................................................................... 10

   I.   Plaintiff does not have standing...................................................................... 10

       A.   The entirety of Plaintiff's alleged harm stems from events in 2018.................. 12

       B.   Plaintiff's injury is self-inflicted.......................................................... 13

       C.   Plaintiff has no statutory standing to assert a claim under Section 1983............. 14

   II.  HB 3107 is constitutional under *Anderson-Burdick.* ................................... 16

       A.   The right to vote is not implicated by this lawsuit............................................. 17

       B.   The burden, if any, of complying with HB 3107 survives *Anderson-Burdick* scrutiny.......................................................................................... 18

          1.   Texans are not required to vote by fax.......................................... 19

          2.   Texas's compelling interest in election security makes it necessary to require a signature at registration. ........................................... 21

          3.   HB 3107 upholds voters' faith in the electoral process and ensures eligible voters are registered accurately.................................... 23

   III.  Plaintiff has no meritorious claim under Section 1971................................. 24

CONCLUSION......................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................ 27

# INDEX OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................................................. 25

*Anderson v. Celebreeze,*
460 U.S. 780 (1983) ..................................................................................... 16, 17, 18

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) ................................................................................................. 10

*Ass'n of Cmty. Orgs. For Reform Now v. Fowler,*
178 F.3d 350 (5th Cir. 1999) .................................................................................. 13

*Blankenship v. Blackwell,*
341 F. Supp. 2d 911 (S.D. Ohio 2004) ................................................................. 20

*Blum v. Yaretsky,*
457 U.S. 991 (1982) ................................................................................................. 15

*Boudreaux v. Swift Transp. Co.,*
402 F.3d 536 (5th Cir. 2005) .................................................................................. 10

*Brnovich v. Democratic Nat'l Comm.,*
141 S. Ct. 2321 (2021) ............................................................................................ 21

*Broyles v. Texas,*
618 F. Supp. 2d 661 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010) ........................ 25

*Burdick v. Takushi,*
504 U.S. 428 (1992) ..................................................................................... 16, 21, 23

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................................. 10

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ..................................................................................... 10, 11, 13

*Clingman v. Beaver,*
544 U.S. 581 (2005) ................................................................................................. 22

*Conn v. Gabbert,*
526 U.S. 286 (1999) ................................................................................................. 14

*Coon v. Ledbetter,*
780 F.2d 1158 (5th Cir. 1986) .......................................................................... 14, 16

*Crawford v. Marion Cty. Election Bd.,*
553 U.S. 181 (2008) ..................................................................................... 18, 22, 23

*Danos v. Jones,*
652 F.3d 577 (5th Cir. 2011) .................................................................................. 14

*Dep't of Commerce v. U.S. House of Representatives,*
525 U.S. 316 (1999) ........................................................................................... 11, 13

*Diaz v. Cobb,*
435 F. Supp. 2d 1206 (S.D. Fla. 2006) ................................................................. 25

*Esshaki v. Whitmer,*
813 F. App'x 170 (6th Cir. 2020) .......................................................................... 22

*Eu v. S.F. Cty. Democratic Cent. Comm.,*
489 U.S. 214 (1989) ................................................................................................. 21

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ................................................................................................. 11

*Howlette v. City of Richmond,*
   485 F. Supp. 17 (E.D. Va. 1978) .......................................................................... 25
*Husted v. A. Philip Randolph Inst.,*
   138 S. Ct. 1833 (2018) ................................................................................... 21, 23
*Ind. Democratic Party v. Rokita,*
   458 F. Supp. 2d 775 (S.D. Ind. 2006) .................................................................. 25
*Keystone Driller Co. v. Gen. Excavator Co.,*
   290 U.S. 240 (1993) .............................................................................................. 20
*League of Women Voters of Nassau Cty. v. Nassau Cty. Bd. of Sup'rs,*
   737 F.2d 155 (2d Cir. 1984) ................................................................................. 16
*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) .............................................................................................. 14
*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................ 10, 11
*McDonald v. Bd. of Election Comm'rs of Chi.,*
   394 U.S. 802 (1969) ........................................................................................ 17, 18
*Mi Familia Vota v. Abbott,*
   497 F. Supp. 3d 195 (W.D. Tex. 2020) ........................................................... 12, 13
*NAACP v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010) ....................................................................... 11, 12, 19
*Nat'l Federation of the Blind of Tex., Inc. v. Abbott,*
   647 F.3d 202 (5th Cir. 2011) ............................................................................... 15
*Org. for Black Struggle v. Ashcroft,*
   No. 2:20-CV-04184-BCW, 2021 WL 1318011, (W.D. Mo. March 9, 2021) ......... 25
*Richardson v. Tex. Sec'y of State,*
   978 F.3d 220 (5th Cir. 2020) ...................................................................... 19, 21, 22
*Storer v. Brown,*
   415 U.S. 724 (1974) ........................................................................................ 16, 17
*Tex. Democratic Party v. Abbott (TDP I),*
   961 F.3d 389 (5th Cir. 2020) ............................................................................... 17
*Tex. Democratic Party v. Abbott (TDP II),*
   978 F.3d 168 (5th Cir. 2020) ............................................................................... 18
*Tex. Democratic Party v. Hughs,*
   474 F. Supp. 3d 849 (W.D. Tex. 2020), *rev'd and remanded*, 860 F. App'x 874 (5th Cir. 2021) ... 15
*Tex. Democratic Party v. Hughs,*
   860 F. App'x 874 (5th Cir. 2021) ........................................................................... 7
*Tex. Indep. Party v. Kirk,*
   84 F.3d 178 (5th Cir. 1996) ................................................................................. 21
*Thompson v. Dewine,*
   976 F.3d 610 (6th Cir. 2020) ............................................................................... 21
*United States v. Ward,*
   345 F.2d 857, 862 (5th Cir. 1965) ....................................................................... 25
*Veasey v. Perry,*
   29 F. Supp. 3d 896 (S.D. Tex. 2014) ................................................................... 15
*Vieth v. Pennsylvania,*
   188 F. Supp. 2d 532 (M.D. Pa. 2002) ................................................................. 15

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ................................................................... 17, 21, 23
*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................... 14, 15

**Statutes**

42 U.S.C. § 1983 ........................................................................................................ 14
52 U.S.C. § 20501 ...................................................................................................... 23
52 U.S.C. § 10101(a)(2)(B) ....................................................................................... 25
Act of May 27, 2013, 83rd Leg., R.S., ch. 1178 (S.B. 910), § 3, 2013 Tex. Gen. Laws 2923,
    2923–24. ................................................................................................................ 3
Act of May 28, 2021, 87th Leg., R.S., ch. 711 (H.B. 3107) ................................... 7,8
Tex. Elec. Code § 13.002 ............................................................................................ 1
Tex. Elec. Code § 13.002(a) ................................................................................... 1, 19
Tex. Elec. Code § 13.002(b) ....................................................................................... 3
Tex. Elec. Code § 13.038 ............................................................................................ 2
Tex. Elec. Code § 13.041 ............................................................................................ 2
Tex. Elec. Code § 13.073 ....................................................................................... 7, 25
Tex. Elec. Code § 13.143(d-2) .................................................................................... 1
Tex. Elec. Code § 13.143(d)(2) ............................................................................... 3, 8
Tex. Elec. Code § 20.001 ................................................................................. 2, 18, 19
Tex. Elec. Code § 20.031 ............................................................................................ 1
Tex. Elec. Code § 20.035 ............................................................................................ 1
Tex. Elec. Code § 87.027 ............................................................................................ 4

**Other Authorities**

David P. Currie, Misunderstanding Standing, 1981 Sup. Ct. Rev. 41, 45 .................... 14

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................. 10

TO THE HONORABLE UNITED STATES DISTRICT JUDGE JASON K. PULLIAM:

Intervenor-Defendant Ken Paxton, in his official capacity as Attorney General of Texas, and Remi Garza, in his official capacity as Cameron County Elections Administrator, respectfully move the Court for summary judgment. Intervenor-Defendant Paxton joins in full the Motion for Summary Judgment filed by Intervenor Defendants Lupe Torres and Terrie Pendley as to Issues 1 and 2 and the arguments that Plaintiff has no private cause of action under Section 1971 and, in the alternative, no meritorious claim under Section 1971 both as pleaded and after considering the evidence at the summary-judgment stage.

## STATEMENT OF GROUNDS & UNDISPUTED FACTS

### I.      Voter Registration Procedures in Texas

1.      To register to vote in Texas, applicants need only fill out and submit an application form to a voter registrar that satisfies Section 13.002 of the Texas Election Code—namely, that it is "in writing and signed by the applicant." Tex. Elec. Code §§ 13.002; 13.143(d-2). Under the Election Code, any "person desiring to register to vote" can submit his or her application to the county registrar by personal delivery, by mail, or by fax machine. Tex. Elec. Code § 13.002(a). If the person needs assistance, the applicant may appoint an agent to submit the application on the person's behalf pursuant to Section 13.003. Further, the Election Code designates certain government offices to act as "voter registration agencies," including the Department of Public Safety (DPS), the Health and Human Services Commission, and public libraries. *Id.* § 20.001. Each of these offices "shall provide a voter registration application form to each" qualified individual "in connection with the person's application for initial services" and "any recertification, renewal, or change of address, unless the person declines in writing." *Id.* at § 20.031. If the voter utilizes the service, then the office "shall deliver to the voter registrar . . . each completed registration application." *Id.* § 20.035. In some counties, upwards of 75 percent of registrants will choose this option. Callanen Dep. at 92:17–93:14, Appx. 167–68.

1

2.      To facilitate this process, Texas has adopted a series of policies aimed at ensuring that eligible voters have both easy access to application forms and the means of submitting them. Appx. 199–203, 217:2–233:8. For instance, Texas permits counties to appoint volunteer deputy registrars, who have the power to not only distribute application forms in the community but also accept them on the county's behalf. Tex. Elec. Code §§ 13.038, 13.041. According to Defendant Bruce Elfant, the Travis County Tax Assessor-Collector, Travis County currently has around 2,500 volunteer deputy registrars that work with his office, who will go "anywhere where there's more than a few people gathered," so that residents may have the opportunity to register to vote where it is convenient to them, such a coffee shop, movie theater, or local event. Elfant Dep. 414:14–21, 421:20–21, 424:3–22, Appx. 326, 328.

3.      The State also ensures access to voter application forms should Texans wish to register on their own initiative. County election officials distribute voter registration applications to groups in their communities to facilitate registration. Appx. 161–62, 68:6–69:12. The Texas Secretary of State provides a copy of the application form on its website, which registrants may fill out and print. *Request for Voter Registration Applications*, TEXAS SECRETARY OF STATE, https://www.sos.state.tx.us/elections/voter/reqvr.shtml (last visited March 24, 2022); Ex. A, Texas Voter Registration Application, Appx. 1.  The Secretary of State will also mail registrants a postage-paid application form upon request, as will their county registrar. Ex. B, Screenshot from sos.state.tx.us, Appx. 2.

4.      Texas's voter registration program has proven successful. For example, in Travis County, 97 percent of eligible residents were registered in the lead up to November 2020 election. Appx. 329, 425:16–427:9.

5.      To improve access to voter registration, the Texas Legislature enacted Senate Bill 910 in 2013, which allowed prospective voters to submit a registration application by facsimile so long as the hard copy of the application was sent by mail to the county registrar within four days of the fax

transmission. Act of May 27, 2013, 83rd Leg., R.S., ch. 1178 (S.B. 910), § 3, 2013 Tex. Gen. Laws 2923, 2923–24. SB 910 did not alter Texas's longstanding requirement that voters provide an original, wet signature on the hard copy submitted by mail. Tex. Elec. Code § 13.002(b) ("A registration application must be in writing and signed by the applicant."). Instead, the point of the "provision was to allow [the registrant] to hold their place in line, to hold their effective date, but to follow it up with the original signed copy of the voter registration application" in the next four business days. Ingram Dep. 95:15–20, Appx. 399; Tex. Elec. Code § 13.143(d)(2) ("For purposes of determining the effective date of a registration, an application submitted by . . . telephonic facsimile machine is considered to be submitted to the registrar on the date the transmission is received by the registrar . . . .").

6.     When SB 910 was adopted, there was no doubt as to its interpretation nor any suggestion that the new law conflicted with the original, wet signature requirement of § 13.002. *See* Appx. 287, 257:6–8; Lopez Dep. 104:8–22, Appx. 509; Appx. 292, 277:16–21. The Secretary of State is aware of no county that read SB 910 to permit imaged signatures before 2018, and the Secretary's annual training to election officials every year since SB 910 was passed instructed election officials on this requirement. Appx. 509, 104:8–22. The four County Defendants[1] have testified similarly. Appx. 165, 82:14–83:14; Appx. 166, 87:5–10; Appx. 500, 65:1–66:8; Appx. 508, 97:7–98:1; Appx. 291–92, 276:16–277:14; Garza Dep. 147:11–148:17, 155:5–21, Appx. 371, 373.

7.     A physical signature guarantees that registrants attest to meeting the qualifications to vote. Ingram Dep. 159:7–160:11, 172:12–173:7 176:8–177:6. Also, with the registration signature on file, early voting ballot boards and signature verification committees may compare a signature at the time of registration with later signatures given during the electoral process if the authenticity of the

---

[1] For the sake of brevity, this term will refer collectively to County Defendants Jacquelyn Callanen, in her official capacity as the Bexar County Elections Administrator; Bruce Elfant, in his official capacity as the Travis County Tax Assessor-Collector; Remi Garza, in his official capacity as the Cameron County Elections Administrator; and Michael Scarpello, in his official capacity as the Dallas County Elections Administrator.

registration or corresponding ballot is in question. Tex. Elec. Code § 87.027; Appx. 173, 113:12–114:10; Appx. 417, 161:3–8; Appx. 420, 179:14–20; Appx. 422, 188:7–18; Scarpello Dep. 84:3–85:1, Appx. 539; Appx. 363, 116:1–12; Tex. Sec'y of State, Election Advisory No. 2022-08 (Jan. 28, 2022), *available at* sos.texas.gov/elections/laws/advisory2022-08.shtml. Registration files at the county are subject to investigation by Texas authorities investigating election-related offenses related to signature misappropriation. Appx. 175–76, 124:21–125:9; Appx. 430, 219:6–220:18; Ex. G, OAG Public Filings & Indictments at pp. 6, 10, Appx. 20, 24.

## II.    Vote.org approaches certain Texas County Officials in 2018.

8.       Founded in 2016, Plaintiff Vote.org is a 501(c)(3) nonprofit, voting registration and get-out-the-vote technology platform that seeks to push internet-based voter registration options. Hailey Dep. 28:6–29:7, Appx. 61; 46:23–47:10, Appx. 66. The users of its web applications are not considered to be members of the organization itself. Appx. 63, 35:6–8; Appx. 79, 101:15–24. In 2018, Plaintiff thought it had found a loophole to circumvent Texas's refusal to adopt online voter registration, and it developed a web application that allowed prospective registrants to input their information into embedded fields and upload an electronic image of their signature. Appx. 66, 47:11–48:15; Appx. 67, 53:13–22; Appx. 72–73, 72:11–74:4. The web application would then transpose the information and signature file onto a voter registration application form and transmit the application form to Plaintiff's fax vendor, who would transmit via fax to the county voter registrar.  Another third-party vendor would then mail a printed version of the application to the county voter registrar. Appx. 66–67, 49:5–50:13. Before developing this application, Plaintiff did not use any facsimile technology to facilitate the registration of voters in Texas. Appx. 73, 75:3–9.

9.       In the fall of 2018, Plaintiff's employees approached an undisclosed number of election officials at the county level in Texas to see where it could turn on its web application. Ex. E, Vote.org Email 1, Appx. 8; Appx. 74, 78:5–79:2. Plaintiff's CEO, Andrea Hailey, acknowledged that there was "some confusion among different election officials" and that "some election

administrators interpreted the law in different ways" Appx. 74, 80:4–10; Appx. 77, 92:11–24; Appx. 86–87, 129:24–131:7; Appx. 114–15, 241:7–242:11. According to Plaintiff, the meetings identified a number of "favorable counties . . . who want[ed] to use the e-sign tool[.]" Appx. 110, 223:3–16. These "favorable counties" include the four County Defendants. Appx. 111–12, 129:24–130:4.

10.     Plaintiff's representatives, however, did not disclose to all the counties when securing their approval that the applications Plaintiff would be sending them would not contain a wet signature. Appx. 213, 275:21–276:11; Appx. 498, 59:16–60:16; Appx. 263, 161:22–162:21; Appx. 370, 141:10–20. In addition, a number of counties Plaintiff approached informed Plaintiff that the county would not participate in utilizing its web application because they did not view the technology as a valid method of voter registration. Appx. 74, 80:11–16; Appx. 77, 92:11–93:11; Appx. 99, 181:5–10. A representative from Dallas County, who worked in election administrations there for a decade, testified that what Plaintiff wanted to accomplish in 2018 was illegal, made him uncomfortable, and could cause voters to be disenfranchised. Appx. 500, 65:1–66:8; Appx. 509, 102:21–103:21; Appx. 511, 110:18–111:1. Despite the  documented confusion among county officials, Plaintiff made no effort to contact the Texas Secretary of State prior to launch of its e-sign tool to determine its compliance with the Election Code. Appx. 98, 177:5–12.

11.     Plaintiff also ran into technical problems that compromised users' registration applications. Approximately 15 percent of the applications submitted through Plaintiff to Dallas County contained signature lines that were blank, blacked out, illegible, or otherwise of such poor quality that they could not be accepted. Appx. 512, 114:8–17. The other counties experienced similar problems during the rollout of Plaintiff's "pilot project." Ex. C, Voter Registration Application from Cameron County, Appx. 4; Appx. 71–72, 68:4–71:19, Appx. 98, 174:20–175:6; Appx. 262–63, 160:2–161:21; Appx. 497, 56:16–20; Appx. 498, 58:15–60:8; Appx. 512, 113:22–114:7; Appx. 370, 142:4–14. The Travis County Tax Assessor-Collector's office, which had been working with Plaintiff to facilitate the fax transmissions, informed Plaintiff that many of the signatures were

"poor . . ., some blank, and some blacked out" and that "[t]his is a real problem and [the office is] concerned about proceeding until this is cleared up." Ex. D, Travis County Emails, Appx. 5; Appx. 262–63 160:2–161:21. To top it off, Plaintiff's "pilot program" failed to transfer all of the applications to county election officials via fax, including *at least* 259 applications in Dallas County. Appx. 515, 125:17–126:21. Plaintiff's CEO admits that their engineering team will need to "fix" the issues with imaged signatures before their web application can be used again. Appx. 72, 71:20–72:8.

12.     Texans using Plaintiff's web application were not informed that they were being asked to participate in a "pilot project" and that their registration applications might be subject to rejection by county officials due to the lack of an original, wet signature. Appx. 99, 180:11–181:4. Nor were Texans informed that Plaintiff had reason to suspect that its program violated Texas law. Appx. 99, 181:5–14. Without a valid signature, an election administrator may consider the registration application void. Appx. 537, 74:20–75:4. Indeed, Dallas County deemed every single application submitted by Vote.org incomplete due to the lack of an original, wet signature as soon as they started arriving, even before the Secretary of State issued a statement. Appx. 513, 117:2–21. The Bexar County Election Administrator also testified that she had decided to return the registration applications independent of her later conversations with the Secretary of State's Office because the applications had no original, wet signatures. Appx. 214, 280:4–281:2.

### III.    Texas Secretary of State issues guidance to counties.

13.     Shortly after the fax transmissions from voters came in with deficient, imaged signatures, the Cameron County Elections Administrator, Remi Garza, sought clarification from the Secretary of State to ascertain if the voter registration applications submitted through Plaintiff's technology complied with the Election Code. Appx. 370, 143:21–144:22; Appx. 424–25, 196:17–197:7. Because the applications lacked an original, wet signature, the Secretary's Office advised Garza that they did not. Appx. 426, 202:13–203:1. Prospective voters seeking to register using Plaintiff's e-sign technology were given the opportunity to cure the deficiencies in their applications after receiving

a "notice of incomplete" pursuant to the Election Code. *See* Tex. Elec. Code § 13.073; Appx. 426, 202:13–203:1; Appx. 206, 248:3–7; Appx. 514–15, 124:17–125:7.

14.     Secretary of State Rolando Pablos issued a statement shortly thereafter clarifying the requirements under the law stating that online voter registration is not available in Texas. Ex. H, Secretary Pablos Statement, Appx. 52.[2] Each of the county election administrators/tax assessor-collectors who received Plaintiff's applications were consulted about the proper application of the registration law, which required sending notices of incompletion. Appx. 52; Appx. 425– 26, 200:2–203:3.

15.     After the Secretary issued the guidance related to voter registration applications, Plaintiff notified the users of its web application that their registrations would not be processed unless action was taken to correct the signature errors. Ex. F, Vote.org Email to Users, Appx. 11; Appx. 137, 330:17–22; Appx. 137, 332:10–19. In its notice, Plaintiff stated that it was "truly deeply sorry for this inconvenience." Appx. 11.

## IV.     Texas passes its latest "cleanup bill," HB 3107.

16.     During the 2021 Legislative Session, Texas passed House Bill 3107, a "cleanup" measure intended to clarify several provisions of the Texas Election Code, but which was not intended to make any substantive changes to Texas election law. Act of May 28, 2021, 87th Leg., R.S., ch. 711 (H.B. 3107); Appx. 398, 92:4–13; Appx. 399, 96:6–97:19; Appx. 163, 75:13–77:1. Section 14 of HB 3107 affirmed that an original, wet signature is required on applications submitted via mail or personal delivery, regardless of whether a copy was previously submitted via fax. *See* Tex. Elec.

---

[2] The Texas Democratic Party, Democratic Senatorial Campaign Committee, and Democratic Congressional Campaign Committee sued the Secretary of State asserting the same legal claims present in this challenge. *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 875–76 (5th Cir. 2021). The Fifth Circuit concluded that the Secretary lacked a sufficient enforcement connection to the wet signature rule under the *Ex parte Young* exception to sovereign immunity and the case was dismissed. *Id.* at 879.

Code § 13.143(d-2).[3]

17.     Neither HB 3107 nor SB 910 changed the longstanding requirement that voter registration applications submitted by mail and personal delivery must contain an original, wet signature—they merely added the opportunity for applicants to set their registration date as the date they fax a copy to their county voter registrar. Appx. 401, 102:3–103:12.

**V.      Plaintiff sues County Defendants.**

18.     After HB 3107 was enacted in 2021, Plaintiff sued the four "favorable" counties. CEO Hailey characterizes Plaintiff's "biggest injury" as allegedly not being able to use its technology "in the most streamlined way"—that it was "wasted technology"—and the time and resources spent in developing the e-sign tool. Appx. 81, 108:9–109:11; Appx. 128, 295:23–296:3.  These injuries are confined to operating expenses in 2018, and were not incurred in response to the passage of HB 3107 in 2021. Appx. 82, 110:14–111:3; Appx. 83, 115:13–116:8. Plaintiff's web application has been turned off in Texas since October 2018. Appx. 70, 62:14–19; Appx. 72, 70:1–21; Appx. 75, 83:13–84:2.

19.     Plaintiff has not produced a breakdown of expenses attributable to not being able to use its technology "in the most streamlined way" or of expenses spent to develop the e-sign tool. What it has produced are its expenses for the years 2018 to 2021, which were $10,407,038 (2018); $3,224,329 (2019); $14,261,934 (2020); and, $1,798,671 (2021) and the projected budget for 2022 is $5,979,009.  Ex. I, Annual Budgets, Appx. 559–60.

---

[3] Section 14's language reads:

> For a registration application submitted by telephonic facsimile machine to be effective, a copy of the original registration application containing the voter's original signature must be submitted by personal delivery or mail and be received by the registrar not later than the fourth business day after the transmission by telephonic facsimile machine is received.

Act of May 28, 2021, 87th Leg., R.S., ch. 711, § 14 (H.B. 3107).

**VI. Challenged Causes of Action**

Defendants Paxton and Garza challenge both causes included in the Complaint: Count I, Violation of Section 1971 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), and Count II, U.S. Const. Amends. I, XIV; 42 U.S.C. § 1983, asserting an undue burden on the right to vote. ECF 1 at pp. 11–12.

**VII. Defendants Paxton and Garza's Grounds for Summary Judgment**

The Court does not have subject-matter jurisdiction over any of Plaintiff's claims because Plaintiff lacks Article III standing, as it has no concrete injury and Defendants do not cause Plaintiff's alleged injury. Further, Plaintiff has no private cause of action under 52 U.S.C. § 10101(a)(2)(B) because the statute authorizes only the Attorney General to bring suit. Plaintiff also lacks statutory standing to sue on behalf of voters under 42 U.S.C. § 1983. The Court need not proceed to the merits for these reasons, but if it does, HB 3107 must be upheld as constitutional under *Anderson-Burdick* because Plaintiff's suit does not implicate the right to vote and because the burden, if any, under HB 3107 is minimal and significantly outweighed by Texas's compelling state interests. Finally, HB 3107 does not violate 52 U.S.C. § 10101(a)(2)(B) because signature requirements are material and no voter is denied the right to vote for a defect in signature.

## STATEMENT OF THE ISSUES

1.      Whether Plaintiff, a nonprofit organization, has standing to assert claims regarding voting rights of parties who are not members of Plaintiff's organization and are not before the Court.

2.      Whether Plaintiff has a constitutional right to submit electronic voter registration applications on behalf of its users by applying an imaged signature to the hard copy required to be mailed to the respective county registrar.

3.      Whether the burden, if any, posed by HB 3107 is constitutional under *Anderson-Burdick* scrutiny when several alternatives to facsimile registration exist for registrants to choose from.

4.      Whether Plaintiff has a cause of action under Section 1971 or the Civil Rights Act when

the statute contains no private right of action and the complaint contains no allegation of racial discrimination.

5.    Whether the requirement to physically sign a voter registration form that is mailed after being faxed to the respective county official violates the materiality provision of Section 1971.

**STANDARD OF REVIEW**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–49 (1986). Movants "must demonstrate the absence of a genuine issue of material fact," but need not "negate the elements of the nonmovant's case." *Id.*; *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

**ARGUMENT & AUTHORITIES**

**I.    Plaintiff does not have standing.**

At its core, Plaintiff's claim is that it has a constitutional entitlement to use any technological method it wants to help Texans register to vote. Standing requires (1) an injury in fact; (2) that the injury be fairly traceable to the alleged wrongful conduct of the defendant; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Because Plaintiff seeks prospective relief, it must establish an "imminent" future injury. *Id.* at 564. The Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact*." Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). "[F]uture injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves." *Id.* at 721. Plaintiff does not assert associational standing on behalf of any members of its organization because the organization does not have members—it therefore can only assert standing based on injuries to the organization, but for the following reasons Plaintiff's claims do

not satisfy the Article III standing threshold. ECF 70 at 3; Appx. 63, 35:6–8; Appx. 79, 101:15–24.

An organization lacks organizational standing unless it satisfies the same Article III requirements applicable to individuals: injury in fact, causation, and redressability. *See NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan*, 504 U.S. at 560–61). In an appropriate case, an organization can establish an injury in fact by showing that the challenged law conflicts with the organization's mission and "perceptibly impair[s]" its activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). At the summary-judgment stage, mere allegations of injury are insufficient and the "plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999) (citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 884 (1990)). A plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that does not itself qualify as an injury in fact. *Clapper*, 568 U.S. at 402. Even if the showing necessary for an injury in fact is slight, "[n]ot every diversion of resources to counteract the defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238.

Plaintiff has suffered no concrete injury caused by the Defendants' enforcement of HB 3107 because it did not divert resources in response to HB 3107 and there is no conflict with its mission for the reasons stated in OAG's Motion to Dismiss and for Judgment on the Pleadings, ECF 53 at pp. 5–6; instead, Plaintiff's alleged harm is the "wasted technology" it developed, and turned off, in Texas *years* before the passage of HB 3107. Appx. 70, 62:14–19; Appx. 72, 70:1–21; Appx. 75, 83:13–84:2, Appx. 81, 108:9–109:11; Appx. 82, 113:2–23; Appx. 128, 295:23–296:3; *see Havens Realty Corp.*, 455 U.S. at 379. Further, Plaintiff's claims that eligible voters will be injured by HB 3107 are not cognizable in the absence of members or the voters as parties to this suit themselves because Plaintiff has no personal stake in the rights it seeks to vindicate. Plaintiff has not and cannot name a single Texan injured by Defendants by HB 3107.

### A.     The entirety of Plaintiff's alleged harm stems from events in 2018.

Plaintiff's CEO admits that the e-sign function of Plaintiff's web application has been turned off since 2018 and all expenses Plaintiff incurred in developing and rolling out the application happened before any County Defendant took an allegedly illegal act against it. Appx. 70, 62:14–19; Appx. 72, 70:1–21; Appx. 75, 83:13–84:2. Therefore, there cannot possibly be any aspect of HB 3107, passed in 2021, that "perceptibly impairs" Plaintiff's future operations for standing purposes. *See City of Kyle*, 626 F.3d at 237. In *Mi Familia Vota*, this Court found that the organization claiming standing had suffered a sufficient injury in fact because the Governor's allegedly unlawful conduct in issuing executive orders during the pandemic was the cause of the plaintiff's injury and that the Court could redress this injury by enjoining those orders. 497 F. Supp. 3d at 209–10. Here, however, HB 3107 was passed in 2021 and it has not been shown to cause any diversion of resources on Plaintiff's part—in fact, the opposite is true because Plaintiff has chosen to keep its application turned off and in compliance with current voter registration law in Texas. Appx. 70, 62:14–19; Appx. 72, 70:1–21; Appx. 7583:13–84:2. As a result, Plaintiff suffers no injury from passage of HB 3107 allowing it to claim standing.

Plaintiff also has not suffered an injury that caused it to divert resources from any readily-identifiable routine activities. *See City of Kyle*, 626 F.3d at 238–39. In *City of Kyle*, the Fifth Circuit held that an association of home builders lacked organizational standing based on its assertion that it undertook efforts to influence local zoning ordinances, which was no different from its routine activities. *See id.* Here, Plaintiff began in 2016 and it did not have a routine practice of offering its e-sign tool to voters in Texas at any point in time. Appx. 61, 28:6–29:7; Appx. 66, 46:23–47:10; Appx. 72-3, 72:11–74:4; Appx. 73, 75:3–9. The assumption of these costs was not a diversion from any identifiable routine activities and therefore cannot form the basis for standing. *See City of Kyle*, 626 F.3d at 238.

Plaintiff has not and cannot show that it diverted resources in response to HB 3107.

Plaintiff did not provide a budget or breakdown of expenditures specific to Texas during discovery. *See* ECF 106 at 2–3 (ordering that the OAG may move to strike any documents relied on by Plaintiff during motions for summary judgment that were not disclosed during discovery). However, it did provide a nationwide budget, which showed the following breakdown of expenditures: $10,407,038 (2018); $3,224,329 (2019); $14,261,934 (2020); and, $1,798,671 (2021). Ex. I, Appx. 559–60. Plaintiff's annual expenditures in 2021 *decreased* by 87.4 % percent from what they were in 2020. No evidence has been disclosed during discovery about Plaintiff's actual expenditures in 2022, but Plaintiff did produce a proposed budget that estimated $5,979,009 in expenditures. Appx. 559. Notably, 2022 is a midterm election year, so Plaintiff's proposed budget for 2022 would still only equal 57.45% of its expenditures during the last midterm election in 2018. *See id.* With no other evidence in the record about expenditures in response to HB 3107, and with both actual and proposed midterm election expenditures significantly decreasing *after* passage of HB 3107 in 2021, Plaintiff cannot show a sufficient diversion resources for standing. *See Dep't of Commerce*, 525 U.S. at 329.

### B.    Plaintiff's injury is self-inflicted.

Causation does not exist when the injury is "self-inflicted" and plaintiffs may not "manufacture standing" by incurring costs in the absence of any governmental harm. *Clapper*, 568 U.S. at 402; *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 208 (W.D. Tex. 2020) (quoting *Ass'n of Cmty. Orgs. For Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)). The testimony in this case shows that Plaintiff's application did not comply with the Election Code. Appx. 74, 78:5–79:2. Plaintiff admittedly had every indication that its technology would cause "confusion," since several counties rejected their proposal to integrate their web application into their registration operations. Appx. 74, 80:4–10; Appx. 77, 92:11–24; Appx. 86–87, 129:24–131:7; 98, 177:5–12; Appx. 114–15, 241:7–242:11. Plaintiff avoided seeking out Secretary of State guidance on this issue. Appx. 189, 177:5–12. Not only does this evidence show that Plaintiff's harm, if any, is self-inflicted, the greater

harm was to the voters whose registrations were gambled as part of Plaintiff's "pilot program" and to whom Plaintiff had to apologize and notify of the need to cure applications. Appx. 11. The Secretary of State's representative testified that Plaintiff was "putting these voters' right to vote and their eligibility – their registration to vote in jeopardy because of their actions[.]" Appx. 425, 197:17–198:20. The Dallas County representative similarly testified that he believed voters could be disenfranchised by Plaintiff's actions. Appx. 511, 110:18–111:1. The harm to the voters, and Plaintiff's own harm, was caused by its own negligence and cannot form any basis for its standing.

### C.      Plaintiff has no statutory standing to assert a claim under Section 1983.

Even if Plaintiff had Article III standing, it would lack statutory standing. Prudential requirements mandate dismissal when a party fails to assert a cause of action regarding its own, personal rights. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014); *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011). Section 1983 provides a cause of action only when the plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a third party's rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates, but without exceptions, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." David P. Currie, Misunderstanding Standing, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos*, 652 F.3d at 582; *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (holding that a lawyer "clearly had no standing" to bring a § 1983 claim for an injury he suffered as a result of "the alleged infringement of the rights of his client" because a plaintiff "generally must assert his own legal rights and interests, and cannot rest

14

his claim to relief on the legal rights or interests of third parties").

Here, all of Plaintiff's claims depend on the right to vote. ECF 1 ¶¶ 25, 29, 35–36. But Plaintiff is an artificial entity without voting rights. Appx. 61, 28:6–29:7; Appx. 66, 46:23–47:10. Plaintiff claims it suffered injury in having to expend resources to comply with the law, but this injury is different in kind from that necessary to establish standing in a voting rights case. "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Nat'l Federation of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)); *cf. Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002) ("It goes without saying that political parties, although the principal players in the political process, do not have the right to vote."). Plaintiff is necessarily asserting the rights of third parties and therefore cannot sue under § 1983. Because this follows from the statute itself, Plaintiff cannot invoke any prudential exceptions. *See Warth v. Seldin*, 422 U.S. 490, 514 (1975).

The Court should not rely on *Texas Democratic Party v. Hughs* (*TDP*) to analyze the statutory standing question in this case. 474 F. Supp. 3d 849, 856 (W.D. Tex. 2020), *rev'd and remanded*, 860 F. App'x 874 (5th Cir. 2021). *TDP* found that organizations could establish standing on behalf of their members who suffered an alleged constitutional harm, not that Section 1983 standing was proper for injuries to the organization itself. *Id.*; *see also Veasey v. Perry*, 29 F. Supp. 3d 896, 907 (S.D. Tex. 2014) ("As observed, however, **associational**[4] standing allows enforcement of the individual member's rights.") (emphasis added). This argument thus depends on Plaintiff asserting that its members suffer a harm of constitutional proportions, which it has not done, and whatever the impact of HB 3107 on Plaintiff's finances, these harms are not actionable under Section 1983 because Plaintiff does not have members and there is no harm to personal voting rights, since

---

[4] Movants do not concede that associational standing also allows an organization statutory standing under Section 1983.

Plaintiff is an artificial organization that does not vote. Appx. 79, 101:3–24. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986); *see also League of Women Voters of Nassau Cty. v. Nassau Cty. Bd. of Sup'rs*, 737 F.2d 155, 160 (2d Cir. 1984) (holding that organization does not have standing to sue under Section 1983 for violations of the personal constitutional rights of others).

Having no voting rights of its own and having no members whose voting rights could have been infringed, Plaintiff has no standing to sue under Section 1983.

## II.     HB 3107 is constitutional under *Anderson-Burdick.*

Nothing in the summary judgment evidence shows that Plaintiff—an artificial entity—is a voter whose constitutional right to cast a ballot in a Texas election is being infringed. What Plaintiff is asserting is a constitutional right to impose its preferred form of voter registration technology on the State of Texas. ECF 1 ¶¶ 18–20. Summary judgment is warranted because Plaintiff has no cause of action a federal court may entertain. But even if Plaintiff's claims did not suffer this fatal flaw, they would suffer another; the burden they allege is minimal and outweighed by Texas's important regulatory interests.

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). In deciding whether an election regulation is constitutional, courts must balance "the character and magnitude of the asserted injury" to the rights the plaintiff seeks to vindicate against "the precise interests put forward by the State as justifications" for the challenged rule, all while taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). When a state election law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the state's important

regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788. The State, after all, has considerable power "to engage in 'substantial regulation of elections" to ensure that elections are well run. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013) (quoting *Storer*, 415 U.S. at 730).

HB 3107 does not encroach on the right to vote whatsoever, and even if it did, the law survives *Anderson-Burdick* review because any burden is miniscule. The Constitution does not include a freestanding right to for individuals to register to vote in whatever manner they or Plaintiff deem most convenient.

### A.     The right to vote is not implicated by this lawsuit.

Plaintiff's constitutional claim fails here because the organization does not possess a right to cast a ballot in Texas, and therefore no evidence shows that Plaintiff is burdened in the constitutional sense—effectively, Plaintiff has no cause of action. When considering a challenge to the limited availability of absentee ballots, the Supreme Court distinguished "the right to vote" from the "claimed right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). It concluded that the plaintiffs' inability to vote by mail did not implicate the right to vote because it did not "preclude[ the plaintiffs] from voting" via other methods. *Id.* at 808. Similarly, the Fifth Circuit has applied this reasoning in the context of *Anderson-Burdick* scrutiny to find that the fundamental right to vote is not implicated by a Texas law that makes age-based distinctions on who may receive and vote by absentee mail ballot as of right. *Tex. Democratic Party v. Abbott* (*TDP I*), 961 F.3d 389, 404 (5th Cir. 2020) (quoting *McDonald*, 394 U.S. at 808 n.7). This is so, the Court said, because the "right to vote is not 'at stake'" if Texas is not prohibiting a plaintiff "from voting by all other means" and where "plaintiffs are welcome and permitted to vote." *Id.*[5]

---

[5] The merits panel that heard later decided the issues in *TDP I* stated that it was not deciding whether *Anderson-Burdick* scrutiny applies the Twenty-Sixth Amendment challenge asserted in that case and left the issue for the district court to decide. *Tex. Democratic Party v. Abbott* (*TDP II*), 978 F.3d 168, 194 (5th Cir. 2020).

The same reasoning applies here. The fax provision of HB 3107 adds to the procedures already available for Texans to register to vote, it does not take anything away from anybody. *See McDonald*, 394 U.S. at 807; *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 144 (5th Cir. 2020) ("Indeed, one strains to see how [the proclamation] burdens voting at all" seeing how it "is part of the Governor's expansion of opportunities to cast an absentee ballot in Texas well beyond the stricter confines of the Election Code."); *cf. Tex. Democratic Party v. Abbott (TDP II)*, 978 F.3d 168, 190–91 (5th Cir. 2020) ("an election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting more difficult for that person than it was before the law was enacted or enforced"). As set forth at length in Undisputed Facts ¶¶ 1–3, *supra*, Texas provides voters with multiple methods by which to register to vote, and registering via a telephonic facsimile machine is but one of many. *See also* Appx. 138, 335:5–18; 336:7–337:5; Bryant Dep. 114:1–11, 142:19–143:15, Appx. 466, 473. Based on the availability of several avenues for Texans who seek to vote, the Court should conclude that the fundamental right to vote is not implicated by Plaintiff's claims and uphold HB 3107 as constitutional on this ground alone.

**B.    The burden, if any, of complying with HB 3107 survives *Anderson-Burdick* scrutiny.**

When the challenged election procedure is reasonable and nondiscriminatory, the State's important regulatory interests are generally sufficient to justify the burden, if any, on the voter. *Anderson*, 460 U.S. at 788. When analyzing the burden, the Court must take care to distinguish the burden of compliance from the consequence of noncompliance with the election provision. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (analyzing the burden on voters of obtaining identification rather than the consequence of attempting to vote without identification). The Supreme Court has always analyzed "the magnitude of burdens . . . categorically and [has] not consider[ed] the peculiar circumstances of individual voters or candidates." *Id.* at 206. Plaintiff cannot show voters are categorically burdened by the availability of registration by fax with hard-

copy confirmation.

### 1. Texans are not required to vote by fax.

HB 3107 does not cause an extra burden on voters, but rather enlarges the procedures available for voter registration by including a fax option in addition to the options that are already available, such as through DPS, designated assistants, direct mail, deputy registrars, designated voter registration agencies, and personal delivery. Tex. Elec. Code §§ 13.002(a), 13.003, 20.001. Even if this Court were to consider fax registration in a vacuum instead of as one option among many, which it should not do, the burden imposed is justified by compelling state interests in ensuring election security. *See Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 224–25 (5th Cir. 2020) ("To further its compelling interest in safeguarding the integrity of the election process, Texas conditions the vote-by-mail privilege on compliance with various safeguards. One of those, at issue here, is signature verification.").

Elfant testified that 97% of people of voting age are registered to vote in Travis County. Appx. 329, 425:16–427:9. Callanen, as one example, stated that she makes all of the several methods of registration available to her constituents to the greatest degree possible so that they have ample opportunity to register, such as having approximately 2,000 deputy registrars to help. Appx. 199–203, 217:2–233:8. If HB 3107 posed any serious burden to any person wanting to register, Defendants could not have had this level of success. Far from being a "severe" burden requiring the State's interest to be narrowly tailored to the harm it seeks to prevent, HB 3107's fax provision imposes a minimal burden by requiring a registrant to physically sign the original application instead of applying an imaged signature, or resort to one of the myriad of alternative options. *See Richardson*, 978 F.3d at 240.

Plaintiff's CEO and expert both concede the availability of several forms of registration outside of fax submission. Appx. 138,  335:5–18, 336:7–337:5; Appx. 466, 114:1–11; Appx. 473, 142:19–143:15. Yet Plaintiff's expert admits that her analysis only assessed the burden under the

fax provision of HB 3107 and she did not account for the several other ways available to registrants that might alleviate any supposed burden. Appx. 473, 142:19–143:15. Indeed, Plaintiff's expert testified that it is easier to locate a printer than it is to locate a fax machine. Appx. 475, 151:7–11.

Further, any burden on voters' rights was caused by Plaintiff itself. It was  Plaintiff, not the counties or the State, that inserted confusion and possible disenfranchisement into the registration process. Ex. C, Appx. 4; Appx. 71-2, 68:4–71:19; Appx. 500, 65:1–66:8; Appx. 509, 102:21–103:21; Appx. 511, 110:18–111:1. The evidence shows that:

- Plaintiff deliberately targeted "favorable counties" that it believed it could talk into using its platform while acknowledging that several counties did not accept Plaintiff's interpretation of the code. Appx. 74, 80:11–16; Appx. 77, 92:11–93:11.

- Plaintiff refused to seek clarification from the Secretary of State. Appx. 98, 177:5–12; Appx. 110, 223:3–16.

- Plaintiff withheld from users that they were part of a "pilot project" that used their applications as ingredients in Plaintiff's experiment to see if its software worked, which it did not. Appx. 4; Appx. 71–72, 68:4–71:19; Appx. 184–85, 160:17–161:21; Appx. 497, 56:16–20; Appx. 498, 58:15–60:8; Appx. 512, 113:22–114:7; Appx. 370, 142:4–14.

In sum, Plaintiff was responsible for disrupting the County Defendants' registration machinery, and Plaintiff was responsible for the resulting uncertainty as to whether any of its users had actually registered. Plaintiff stacked the dynamite and Plaintiff lit the fuse; this lawsuit is its attempt to blame the Defendants for the damage and debris. *See Blankenship v. Blackwell*, 341 F. Supp. 2d 911, 924 (S.D. Ohio 2004) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1993)) (doctrine of unclean hands barred plaintiff from seeking equitable relief, not "as a punishment but rather to further 'the advancement of right and justice'").

2.      **Texas's compelling interest in election security makes it necessary to require a signature at registration.**

"Texas 'indisputably has a compelling interest in preserving the integrity of its election process.'" *Richardson*, 978 F.3d at 239 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)). HB 3107 imposes only minimal, non-discriminatory burdens if any, and the statute is therefore subject to relaxed scrutiny and Texas need only point to a "legitimate state interest[]" to justify HB 3107 under *Anderson-Burdick* scrutiny. *See Burdick*, 504 U.S. at 434; *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 184 (5th Cir. 1996). First, HB 3107 helps maintain accurate voting rolls and combat the use of fraudulent signatures. Appx. 175–76,  124:21–125:9;  Appx. 430, 219:6–220:18; Ex. G at pp. 6, 10, Appx. 20, 24; *see Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021).

> One strong and entirely legitimate state interest is the prevention of fraud. Fraud can affect the outcome of a close election, and fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight. Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome.

*Id.* Inaccuracies in voter registration are a serious problem: "It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate." *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018). "Any corruption in voter registration affects a state's paramount obligation to ensure the integrity of the voting process and threatens the public's right to democratic government." *Steen*, 732 F.3d at 394. Accordingly, Texas has a weighty "interest in preventing voter registration fraud," *id.* at 394–95, and other conduct that frustrates the operation of the electoral process by inserting confusion and disruption as Plaintiffs did to the County Defendants.

When statutes that are duly enacted by the Texas Legislature require physical signatures as a part of the electoral process, federal courts err under *Anderson-Burdick* if they rewrite those statutes to compel allowance of signatures by electronic means, even in the midst of a global pandemic. *See Thompson v. Dewine*, 976 F.3d 610, 620 (6th Cir. 2020); *Esshaki v. Whitmer*, 813 F. App'x 170, 172

(6th Cir. 2020) (citing *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)). And the Fifth Circuit has recently found that Texas's statutory scheme allowing for the comparison of a voter's signature on the carrier envelope for a mail-in ballot against a voter's signature on the mail-in ballot application passes the constitutional test under *Anderson-Burdick*. *Richardson*, 978 F.3d at 238 (citing *Crawford*, 553 U.S. at 239 (Breyer, J., dissenting)). The Fifth Circuit noted that both the opinion for the Court and Justice Breyer's dissent in *Crawford* agree that a "requirement that voters 'sign their names so their signatures can be compared with those on file" and the counting of "a provisional ballot . . . if the state 'determines that his signature matches the one on his voter registration form" are not unconstitutionally burdensome. *Id.* (quoting *Crawford*, 553 U.S. at 197 (plurality op.), 239 (Breyer, J., dissenting)). If the signature comparison scheme is constitutional, it stands to reason that requiring a signature at the time of registration—in the first instance—is also constitutional because the burden is nondiscriminatory and minimal, and the requirement serves the important regulatory interests of the State in preventing fraud in the electoral process. *See id.* at 239–40. The Texas Secretary of State has advised Defendants that signature verification committees or early voting ballot boards may look to a voter's "past signatures on file with the early voting clerk or voter registrar" if the authenticity of signatures comes into question. Tex. Sec'y of State, Election Advisory No. 2022-08 (Jan. 28, 2022), *available at* sos.texas.gov/elections/laws/advisory2022-08.shtml.

To achieve its interest in securing the election, Texas investigates alleged voter fraud by analyzing signatures on voter registration records with the assistance of county election administrators—movants are not asserting a hypothetical state interest in this regard. Appx. 175, 124:21–125:9; Appx. 430, 219:6–220:18; Appx. 20, 24. Without good exemplars of a person's physical signature, authorities could not achieve indictments against defendants accused of using false signatures of others to perpetrate election fraud through mail ballots. Appx. 20; *see Richardson*, 978 F.3d at 238.

Plaintiff may take the position that its use of imaged signatures serves all of these purposes the same as a written signature would, but the evidence in this case proves that notion dubious—Plaintiff's software produced images of signatures that were in many cases illegible and which the county officials viewed as unacceptable. Appx. 4–5; Appx. 262-3, 160:2–161:21; Appx. 184, 160:17–161:21; Appx. 497, 56:16–20; Appx. 498, 58:15–60:8; Appx. 512, 113:22–114:7; Appx. 370, 142:4–14. Plaintiff's suggestion that Texas accepting signatures on an electronic pad via DPS is equivalent to its users submitting imaged signatures is a mischaracterization because DPS does not utilize "imaged signatures" to facilitate registration. Appx. 390, 59:19–60:2, Appx. 391, 61:19–62:12. The signature is captured by an electronic pad controlled by DPS in front of a state official inside of a state run facility. *Id.* Even Plaintiff's own expert admits that this methodology is more secure than permitting digital signatures in an online setting. Appx. 466, 114:1–11. On these facts, Plaintiff is unable to carry its summary judgment burden to demonstrate that the State's interests in preventing the proliferation of fraudulent signatures in voter registration is not served by HB 3107's signature requirement. *See Crawford*, 553 U.S. at 202–03 (citing *Burdick*, 504 U.S. at 439).

### 3. HB 3107 upholds voters' faith in the electoral process and ensures eligible voters are registered accurately.

Texas also has compelling interests in ensuring accuracy of its registration rolls and maintaining voter confidence in its electoral system. *E.g.*, *Husted*, 138 S. Ct. at 1864 n.* (Sotomayor, J., dissenting) (citing 52 U.S.C. § 20501); *Steen*, 732 F.3d at 394. Plaintiff does not appear to challenge the requirement that all voter registration applications submitted by mail contain a wet signature; instead, it appears to only challenge the requirement that applications submitted by both fax *and* mail contain a wet signature. ECF 1 at 6. Facsimiles are prone to transmission errors that can cause the image to fail to transmit either entirely or partially, or result in an illegible image. Appx. 372, 149:1–150:1. These problems can occur for any number of reasons, including busy or interrupted telephone lines, human error, improperly loaded paper, empty ink cartridges, and any number of

other problems. *Id.*

When a voter registration application arrives by mail, and the county has no record of previously receiving it by fax due to a transmission problem, it is treated as a new voter registration application submitted by mail.  Appx. 369, 139:2-13, Appx. 372, 150:16–151:1. It is undisputed in this matter that voter registration applications submitted solely via mail require a wet signature. *See* Appx. 369, 137:9–12. The wet signature requirement serves a practical purpose because an eligible voter will still be registered by mail when their fax failed due to a transmission error – but only if the mailed copy contains a wet signature.

These problems aren't hypothetical. Dallas, Travis, and Bexar Counties experienced problems with legibility of the faxes Plaintiff sent. Appx. 4; Appx. 71–72, 68:4–71:19, Appx. 98, 174:20–175:6; Appx. 262–63, 160:2–161:21; Appx. 497, 56:16–20; Appx. 498, 58:15–60:8; Appx. 512, 113:22–114:7; Appx. 370, 142:4–14. Approximately 15 percent of the applications submitted by Plaintiff to Dallas County contained signature lines that were blank, blacked out, illegible, or otherwise of such poor quality that they could not be accepted. Appx. 512, 114:8–17. Dallas County also did not receive, at a minimum, 259 applications that should have been faxed to them by Plaintiff. Appx. 515, 125:17–126:21. All of these voters would be registered by mail had the copy of their applications arriving by mail contained a wet signature. Maintaining an electoral system that allows the loss of 15 percent of registration applications would severely harm voters' faith in a working democracy—yet that is the result Plaintiff seeks by this suit. *See Steen*, 732 F.3d at 394.

## III.   Plaintiff has no meritorious claim under Section 1971.

Plaintiff's claims under 52 U.S.C. § 10101(a)(2)(B) (Section 1971 of the Civil Rights Act of 1964) fail for all of the reasons articulated in OAG's Motion to Dismiss, ECF 53 at pp. 10–14, which he respectfully asks the Court to reconsider, and for the reasons articulated in County-Intervenor's Motion for Summary Judgment, which he joins in full. The Court should find that Section 1971 does not create a private cause of action for Plaintiff because its language allows only

the Attorney General to bring suit and because the Supreme Court's reframing of the requirement to find a private cause of action in *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), requires dismissal. The Court should also find that Plaintiff failed to state a claim for which relief may be granted because the Complaint does not allege that HB 3107 is racially discriminatory. *See Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010) (quoting *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006)).

Should the Court instead find that it must reach the merits of Plaintiff's Section 1971 claim, the evidence establishes as a matter of law that HB 3107's signature requirement is material, *see* Section II, *supra*, just as other courts have found. *Org. for Black Struggle v. Ashcroft*, No. 2:20-CV-04184-BCW, 2021 WL 1318011, at *5 (W.D. Mo. March 9, 2021) (signature is material to voter qualification); *Howlette v. City of Richmond*, 485 F. Supp. 17, 22–23 (E.D. Va. 1978); *see also Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1211 (S.D. Fla. 2006) (check boxes regarding felon, citizen, and mental-incapacitation status are material). Additionally, however, the provision is material to ascertaining the qualification of the voter because any person who refuses to subject themselves to Texas's common-sense fraud prevention measures by refusing to sign is disqualified from registering to vote, and because a defect in signature does not result in "denial" of the right to vote under Section 1971—the registrant is given the chance to correct the signature defect within 10 days to preserve the same effective date.   52 U.S.C. § 10101(a)(2)(B); Tex. Elec. Code § 13.073; *see United States v. Ward*, 345 F.2d 857, 862 (5th Cir. 1965); Appx. 426, 202:13–203:1.

## CONCLUSION

Defendants Paxton and Garza request that the Court grant this Motion for Summary Judgment and enter a judgment dismissing all of Plaintiff's claims.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

CHRISTOPHER D. HILTON
Chief, General Litigation Division

*/s/ Cory Scanlon*
**CORY A. SCANLON**
State Bar No. 24104599
cory.scanlon@oag.texas.gov
Assistant Attorney General
**KATHLEEN T. HUNKER\***
State Bar No. 24118415
kathleen.hunker@oag.texas.gov
Special Counsel
**JOHNATHAN STONE**
State Bar No. 24071779
johnathan.stone@oag.texas.gov
Assistant Attorney General
**MICHAEL R. ABRAMS**
State Bar No. 24087072
michael.abrams@oag.texas.gov
Assistant Solicitor General

*Admitted *pro hac vice*

Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone (512) 463-2120
Facsimile: (512) 320-0667

*Counsel for Intervenor-Defendant Ken Paxton, in his official capacity as Attorney General of Texas*

26

*/s/ Daniel N. Lopez*
DANIEL N. LOPEZ
ASSOCIATE COUNSEL
TEXAS STATE BAR NO. 24086699
EMAIL: DANIEL.N.LOPEZ@CO.CAMERON.TX.US
JUAN A. GONZALEZ
ATTORNEY IN CHARGE
TEXAS STATE BAR NO. 08129310
EMAIL: JUAN.GONZALEZ@CO.CAMERON.TX.US
COMMISSIONERS COURT –
CIVIL LEGAL DIVISION
1100 EAST MONROE STREET
BROWNSVILLE, TEXAS 78520
TELEPHONE: (956) 550-1345
FACSIMILE (956) 550-1348

**ATTORNEYS FOR DEFENDANT REMI GARZA**

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2022 a true and correct copy of the foregoing document has been sent by electronic notification to all counsel of record through ECF by the United States District Court, Western District of Texas, Austin Division.

*/s/ Cory Scanlon*
CORY A. SCANLON
Assistant Attorney General